HUNTER MFG. & COMMISSION CO. v. MEBANE et al.

No. 2979.

Circuit Court of Appeals, Fourth Circuit.

Sept. 19, 1930.

M. G. McDonald, of Greenwood, S. C. (Park, McDonald & Todd, of Greenwood, S. C., on the brief) for appellant and cross-appellee.

A. L. Gaston, of Chester, S. C., and Aubrey L. Brooks, of Greensboro, N. C. (David Hamilton, of Chester, S. C., and Brooks, Parker, Smith & Wharton, of Greensboro, N. C., on the brief), for appellee and cross-appellant and appellees.

Before NORTHCOTT, Circuit Judge, and GRONER and ERNEST F. COCHRAN, District Judges.

GRONER, District Judge.

Republic Cotton Mills is a cotton manufacturing company located at Great Falls, S. C., and will be called Republic Company. Hunter Manufacturing & Commission Company is a North Carolina corporation whose principal business is to act, as the selling agent of southern cotton mills, and will be called the Hunter Company. Duke Power Company is a Delaware corporation, which at the time this controversy arose was the holder of a majority of the shares of stock of the Republic Company. Robert S. Mebane, a resident of South Carolina, was president of the Republic Company, and H. B. Mebane, his brother, also of South Carolina, was treasurer.

In July, 1927, Robert Mebane was indebted to sundry persons and corporations in excess of a million and a quarter dollars, and at the time was holder of 6,187 shares of the stock of the Republic Company. He was also owner of real estate and shares of stock in certain other corporations, which he valued at approximately $400,000. His shares in the Republic Company were pledged to secure an indebtedness amounting in round figures to $675,000. His unsecured indebtedness was nearly $700,000, of which about $425,000 was due the Republic Company, evidenced by the joint note of himself and his brother, H. B. Mebane for the sum of $473,000, secured by collateral to the extent of $48,000. He owed the Hunter Company about $252,000, secured by the pledge of part of his Republic stock, and, in addition, about $200,000 unsecured. At the time of the agreement now to be mentioned, H. B. Mebane owned about 3,600 shares of stock in the Republic Company, and on July 21, the two Mebanes, wishing to secure funds with which to pay in full the indebtedness to Republic Company, entered into a contract with Duke Power Company for the sale of their holdings of Republic stock at the price of $153.33 per share, and in the agreement authorized the Duke Company out of the proceeds to pay first the secured indebtedness of Robert Mebane, then to pay the joint indebtedness of the brothers to the Republic Company, and when this was accomplished, to purchase or pay the claims of any other creditor of Robert Mebane who might attack the contract as a perference in bankruptcy, and then to pay the balance to H. B. Mebane.

Simultaneously with the making and execution of this agreement, and in order to provide, as far as possible, the payment to Hunter Company of his unsecured indebtedness to it, amounting to around $204,000, Robert Mebane, his wife, and son entered into a written agreement with Hunter Company assigning to it their respective equities in certain shares of stock, and their interest in certain real estate located in North and South Carolina, and H. B. Mebane joined in the agreement for the purpose of assigning to Hunter Company his interest to the extent of $100,000 in the balance or remainder of the fund, to which he was entitled, derived from the sale of his Republic stock, but upon condition that he should share to the extent of his contribution pro rata with

Hunter Company in the distribution of the proceeds of the sale of his brother Robert's property. Pursuant to this agreement, Robert Mebane ten days thereafter executed and delivered to Hunter Company deeds of conveyance to the real estate, and transferred and delivered the personal property covered under the agreement. It was for the purpose of having this agreement construed, and to secure a judicial sale of the real estate, and to obtain a decree against Robert Mebane for any deficiency after applying against his debt the proceeds of the pledged property, that this suit was brought.

The answer of Robert Mebane challenged the right of the Hunter Company to a decree for any amount against him on the ground that the acceptance by it of the personal property and of the deeds to the real estate was in full discharge of his indebtedness to it, and on other grounds which, to the extent we think necessary, will be noticed hereafter. By consent of parties, the cause was referred to a master to state the account, and report his findings of fact and conclusions of law. In the hearings before the master, the contract of sale between the Mebanes and the Duke Company, as well as the contract between the former and the Hunter Company, were introduced in evidence, together with statements of account showing the application of the stock purchase money to the indebtedness, secured and unsecured. It was also shown that after the execution of the contracts, a bankruptcy proceeding was begun against Robert Mebane by New York brokers, to whom he owed approximately $38,000, to settle which the Duke Company, with the consent and approval of the Hunter Company, paid in settlement of said claims, out of the H. B. Mebane surplus in its hands, approximately $25,000, and secured a dismissal. The findings of the master were that since the purchase of the brokers' claims was derived from funds which otherwise would have been payable to the Hunter Company for the account of H. B. Mebane, or to H. B. Mebane personally if his surplus was otherwise sufficient to carry out his contract with Hunter Company, as to which the record is not clear, the latter was subrogated to the rights of the original holders, and was entitled to share in the proceeds of Robert Mebane's property pro rata with Hunter Company on the basis of the face amount of these claims. He likewise found that the payment of an item of $16,000 by the Duke Company to the Hunter Company as a secured debt was unauthorized because that item was in fact unsecured, and that the sub-

sequent repayment of same by the Hunter Company to the Duke Company was in order and left that amount still due and unpaid to the Hunter Company, and which it was entitled to have included in the deficiency decree against Robert Mebane; and he held against Robert Mebane in his contention that the agreement of July 21 between himself and the Hunter Company, and the delivery of the personal property and the real estate made pursuant thereto, was a full and complete discharge of his whole indebtedness. Upon exceptions to the report of the special master (which do not appear in the record though noticed in the decree), the District Court sustained the report of the master in all respects except in relation to the $16,000 debt, and held as to it that it was secured, and was properly paid by the Duke Company from the sale of the stock of Robert Mebane, and that the Hunter Company should not have refunded this payment to the Duke Company, and that therefore it could not now be included in any judgment the Hunter Company was entitled to against Robert Mebane. From this final decree, cross-appeals were taken, and the questions which we have to decide are: First, whether the $16,000 debt was a secured debt, and was properly paid as such; second, whether H. B. Mebane is entitled to be subrogated to the rights of the broker creditors in the full amount of their claims against his brother Robert Mebane; and, third, whether under the agreement between Robert Mebane and the Hunter Company, and the subsequent execution of the deeds to the real estate, and the handling or appropriation by it of the property, the debt of Robert Mebane to the Hunter Company was extinguished.

With relation to the first of these questions, the undisputed evidence shows that the $16,000 debt is the balance due, with accrued interest, on an original loan of $80,000 made by the Hunter Company to Robert Mebane in December, 1924. The loan was arranged by correspondence, Mebane being at the time in South Carolina, and the officer of the Hunter Company with whom he dealt, in New York. Mebane wrote the Hunter Company as follows:

"Upon receipt of this letter please deposit on Saturday morning the 6th instant, $80,000.00 to my personal credit in the National City Bank of New York, and confirm to me. The collateral you are holding is to be used as security for this advance, and I will forward check shortly to pay same."

The Hunter Company accepted these

terms, and deposited the money as directed, and at that time held Mebane's Republic Company stock largely in excess of the amount of the loans for which it was pledged. From time to time payments were made on account of the debt, until in July, 1927, the debt had been reduced to sixteen thousand odd dollars, and in the Duke agreement, the parties, including the Hunter Company, recognized this balance as a secured debt, and provided for its payment on an equality with the other secured debts, and this was done. As against this, it is insisted that because the Hunter Company carried the item on its books as an open account, it had thereby waived its security, and had no right afterwards to insist upon the payment of the same as a secured debt out of the proceeds of the stock sold to the Duke Company. The learned district judge held against this contention, and in this we concur.

It may well be asked in passing why the Hunter Company, with its debt paid under an agreement to which all parties concerned had agreed. should thereafter, at the instance of H. B. Mebane, refund the amount and be content now to seek a deficiency judgment for it against an admitted insolvent. But without regard to what its motive may have been, or to the very natural query, who holds the money now—as to all of which the record is silent—we are convinced that it acted in this respect in disregard of its legal rights, as well as its legal obligations. At the time it made the $80,000 advance, it had in its hands ample collateral to secure the same. Its borrower then and there pledged his collateral as a condition of and inducement for the loan. When later he contracted to sell the collateral, he recognized his obligation to the Hunter Company to pay the debt as a condition of its release, and to this arrangement all parties, including the Hunter Company and H. B. Mebane, consented, and the payment was made accordingly. The suggestion now that the inclusion of the $16,000 item as a secured debt was a clerical mistake, is too unsubstantial to be given weight, and the contention that the Hunter Company so understood the agreement and carried the item in its books as an open account, without designating it as secured or unsecured, is, if granted, insufficient to change the formal written agreement of the parties when the debt was created, or the equally formal written agreement when payment was provided. It would be to substitute for the written contract a new and different agreement to which one of the parties at least had never given his assent. The contract between the parties was the letter of December, 1924.

Its terms are perfectly plain. There is no uncertainty or ambiguity about it, and there is no evidence that at any subsequent time its terms were changed and another contract substituted in its place. In this view of the case, it is clear that H. B. Mebane had no right to object to the payment of this item out of the funds received from the sale of the stock, and the Hunter Company, having received it in discharge of the debt, had no right to refund it, and equally no right now to include it with the other indebtedness of Robert Mebane for which it is entitled to a decree.

The two remaining questions may be briefly disposed of.

H. B. Mebane was made a defendant in the complaint filed by the Hunter Company, and in his answer he alleges that he was a party to the two agreements made in July, 1927, and that his money was used, pursuant to these agreements, to purchase the claims of the New York brokers against his brother Robert and that he thereby became entitled, as the assignee of such claims, to all of their rights, and, by virtue of his subrogation, to share on that basis in the proceeds of the sale of his brother's other property. The ground of this is that part of the contract with the Hunter Company as follows:

"The said H. B. Mebane undertakes and agrees to purchase from the party of the third part (Hunter Company) such portion of the principal of said unsecured indebtedness of the said Robert S. Mebane to said party of the third part not exceeding in the aggregate One Hundred Thousand Dollars ($100,000.00) of the principal amount thereof as the funds received by him from the sale of his shares in the Republic Cotton Mills under the agreement hereto annexed may so purchase as and when said funds are received, for which purpose the said H. B. Mebane hereby assigns to the party of the third part (Hunter Company) and directs said Duke Power Company to pay to the party of the third part any residue of funds belonging to said H. B. Mebane to the extent of said purchase under and according to the terms of the agreement hereto annexed. And to the extent of such purchase the said H. B. Mebane shall be entitled pro rata with the party of the third part and the properties of the said first parties and the transfers, assignments, conveyances and other instruments executed and delivered by them for the security and payment of said indebtedness."

As has been already stated, the Duke Company, under its purchase agreement of

the stock of the two Mebanes, paid out of the proceeds of the sale of H. B. Mebane's stock $25,000 in settlement of the claims of certain New York brokers against his brother Robert Mebane. This payment was made under that provision of the Duke Contract authorizing it to use so much of the residue of said purchase money as might be necessary to protect itself and the Republic Company against the effect of bankruptcy proceedings. When, therefore, the proceedings in bankruptcy were begun by the New York brokers the Duke Company, by agreement of all concerned, purchased these claims at a discount, and took an assignment of them, which H. B. Mebane now claims inured to his benefit and entitles him to stand in the shoes of the brokers and to demand face value of their claims with interest, and under the Hunter Company contract, prorate with that company the moneys received by it from the sale of Robert Mebane's property. The District Court, in passing on this claim, recognized H. B. Mebane's right to participate in the assets of Robert Mebane transferred and conveyed to the Hunter Company to the full extent of the face value of the brokers' claims, rather than to the actual amount paid out in payment and settlement of them. This, we think, was incorrect. The agreement between the Duke Company and the two Mebanes was an outright contract of sale of their respective shares of stock in the Republic Company at an agreed price with authority to the Duke Company to pay the debts for which the stock was then pledged, including the debt to the Hunter Company for which the stock held by it was collateral, and then to pay the joint debt of the brothers, amounting to $473,000, to the Republic Company, and to retain the residue until the danger of attack of the validity of the contract was passed, and to pay from the residue such amount as might be required to preserve the contract, and any balance remaining to pay to H. B. Mebane, or his assigns.

Precisely the thing anticipated occurred when the claims of the New York brokers resulted in a proceeding in bankruptcy, and in accordance with the authority granted by both Mebanes, and with the consent of the Hunter Company, which under its agreement with the two Mebanes was entitled to $100,000 of the H. B. Mebane surplus, the brokers' debts were bought at a discount. But this was not a new transaction. It had no similarity to an independent purchase of a debt by one person against another. It was done in pursuance of a general plan to accomplish a definite purpose, namely, the sale of the stock of the two Mebanes at a price satisfactory to them in order that thereby their indebtedness to the company of which they were officers might be paid in full. It is quite true that H. B. Mebane in this transaction contributed his personal assets to the payment of his brother's indebtedness, but it was distinctly provided in the contract that as between the brothers any indebtedness as between them, whether or not arising out of the contract, should be a matter solely between them, and should give neither of them any right to impose any liability as against the other contracting parties on account of any act done in carrying the same into effect. In our view, therefore, the purchase of the brokers' claim, made under authority of the contract, was a purchase out of the joint funds of the two brothers, and in an accounting between them, is recoverable by the one whose money accomplished the result to the extent, and only to the extent, that it impinged upon his agreed share of the contribution to the common purpose. It is not the case of an unqualified assignment to H. B. Mebane because his funds enabled it to be done, and as between himself and the Hunter Company, under his contract to purchase up to $100,000 of his brother's general indebtedness, it should be treated as a payment on that account only to the extent that it actually reduced his ability to carry out that agreement, and his right to share pro rata with Hunter Company in the proceeds of the sale of the properties delivered by his brother Robert to the Hunter Company arises only out of the consent of that company that it should be so treated.

This leaves only for decision the contention of R. S. Mebane that the agreement under which he transferred his property to the Hunter Company was an assignment for benefit of creditors, and therefore was accepted in full discharge of his indebtedness; his contention that the legal effect of the demand and acceptance of the deeds to the real estate made after the execution of the original agreement transferred complete and absolute title, and was therefore accepted in full of his indebtedness to that company; and finally his contention that the unlawful handling and conversion of his property discharged his liability.

As to the first, we have examined the agreement, and find in it nothing to indicate that it was an assignment for the benefit of creditors. On the contrary, it is no more than a contract to deliver certain designated personal property and shares of stock, and to convey certain described real estate—all as security for an acknowledged debt. The

agreement states that the property delivered and to be conveyed is so delivered and conveyed as security for a stated indebtedness. It is not an assignment or a transfer for the payment of general debts, but a trust for the payment of a particular debt, and under its terms we think it clear that if only a part of the property was necessary in payment of the debt, Robert Mebane would have been clearly entitled to demand return of the balance. Notwithstanding therefore the absolute conveyance of the real estate in fee, we think it clear that as between the parties —and there are no other parties involved in this aspect of the controversy—the agreement and the conveyance created merely an equitable lien on the property in favor of the Hunter Company, and that the property itself remained the property of Robert Mebane, subject to the lien of the trust, until its object was accomplished. Likewise, the subsequent transfer of the real estate by Mebane to the Hunter Company some ten days after the contract was made would not have the effect of extinguishing the indebtedness, for the execution and delivery of the deeds was pursuant to the agreement, which in terms provided that this should be done. There was neither in the contract nor in the deeds a provision that they were accepted in extinguishment of the debts, and we are of opinion that in the circumstances, they were in the nature of a mortgage, and that when converted into money, and the debt paid, the balance, if any, should be returned to Robert Mebane, or to his brother H. B. Mebane, as their interests may appear.

Equally without any merit is the claim of unlawful conversion. It is quite true the real estate was rented, but this was clearly a duty which the Hunter Company owed to Mebane after the delivery to it, and as to this and all else its conduct was characterized by fairness and with a proper conception of its duty, and therefore no more need be said on this subject.

Reversed in part.

Affirmed in part.